[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
CT Page 5118-CC
I.
 Introduction and Factual Background
The above captioned cases are appeals of decisions of the defendant Zoning Board of Appeals of the Town of North Branford (hereinafter, "the Board") and defendant Planning and Zoning Commission of the Town of North Branford (hereinafter, "the Commission") denying plaintiff Frank R. Frumento's applications to construct an affordable housing subdivision[1] on his 39 acre property on the northerly side of Foxon Road. The applications and the resulting decisions are part of a number of applications, approvals, denials, and appeals involving the plaintiff, the Commission, and other town administrative boards concerning the development of this parcel.
An abbreviated history indicates that in 1990, Mr. Frumento filed an application to establish an affordable housing zone and rezone his property to allow such development. The application was denied and the appeal was eventually dismissed.[2] On December 5, 1991, the Commission adopted its own affordable housing regulations and the plaintiff filed a new application under these regulations to both rezone and develop the subject property. The application to rezone was granted but the request for a 42 lot subdivision was denied as the Water Pollution Control Authority (hereinafter, "the Authority") only authorized 31 connections. Mr. Frumento did not appeal the Commission's denial but did seek review of the Authority's denial.[3] At the same time, he also sought review of the regulations adopted by the Commission.[4] Although that appeal was eventually dismissed, the Commission did enact certain amendments to the regulations.
On October 20, 1993, the plaintiff sought a variance from § 42A.8.2 of the zoning regulations that mandates that all lots in an affordable housing development be serviced by municipal sewer service to permit on-site septic systems on eleven of the forty-two lots. The Board denied that request on November 22, 1993 and the first of the present appeals was filed.
In the second appeal, the plaintiff is seeking review of the Commission's April 21, 1994 denial to construct a 42 lot affordable housing subdivision. Additionally, pursuant to General CT Page 5118-DD Statutes § 8-30g(d), the plaintiff filed a modified application requesting 31 lots — which was denied by the Commission on June 21, 1994.
 II. Discussion
 A.
1.
The trial on these matters was delayed a number of times due to negotiations between the parties. At trial, on March 12, 1996, the defendants filed a motion to dismiss maintaining that both cases were moot on the grounds that certain actions taken by the plaintiff precluded any possible benefit or relief that the plaintiff might obtain if successful in either appeal. Supplemental briefs were thereafter filed. The town agencies maintain that in September, 1989, before the subject land was purchased by the plaintiff, the prior owner received approval, valid for five years, for a 31 lot subdivision known as Ashley Park. In August, 1994, subsequent to filing these appeals, the plaintiff requested and received a five year extension for said approval to September 7, 1999. On June 2, 1995, the plaintiff recorded the Ashley Park subdivision map. The plaintiff then applied for and received four building permits, constructed foundations on two lots, completed a house on a third lot, and constructed the road. Additionally, the plaintiff advertised the lots for sale. The defendants argue that these actions implicate the statutory provisions concerning approval of subdivisions and thwart the plaintiff's claims for relief. As this argument mainly applies to the second case, i.e. the appeal from the Commission's decision, it will be discussed first.
2.
General Statutes § 8-18 defines subdivision as:
 "subdivision" means the division of a tract or parcel of land into three or more parts or lots made subsequent to the adoption of subdivision regulations by the commission, for the purpose, whether immediate or future, of sale or building development expressly excluding development for municipal, conservation or CT Page 5118-EE agricultural purposes, and includes resubdivision.
(emphasis supplied).
Resubdivision, however, is defined in the same section, as:
 A change in a map of an approved or recorded subdivision or resubdivision if such change (a) affects any street layout shown on such map, (b) affects any area reserved thereon for public use or (c) diminishes the size of any lot shown thereon and creates an additional building lot, if any of the lots shown thereon have been conveyed after the approval or recording of such map.
The affordable housing regulations are based on open space subdivisions and both a special use permit and a subdivision permit are required. (Return Item 22, § 42A.8.20). General Statutes § 8-26 states, in part, that "[t]he commission may hold a public hearing regarding any subdivision proposal if, in its judgment, the specific circumstances require such action. Noplan of resubdivision shall be acted upon by the commissionwithout a public hearing." (emphasis added). The defendant's argument is that both the road layout and the area reserved for public use in the affordable subdivisions differ from that in the approved and recorded subdivision and thus, constitute a resubdivision. Moreover, it contends that as the plaintiff has not complied with the public hearing requirement, the plaintiff must "start over". Accordingly, the Commission argues that this case is now moot. To the extent the suggestion of mootness implicates subject matter jurisdiction, this court must address this issue. Gagnon v. Planning Commission, 222 Conn. 294, 297,608 A.2d 1181 (1992).
3.
The first question that must be addressed is whether the actions of the applicant do, in fact, trigger the resubdivision definition. The plaintiff argues that none of his actions in furtherance of the Ashley Park approval impact his ability to proceed on the affordable housing applications. He testified that the constructed house would not alter anything as the lot configuration would be the same whether it was part of the approved subdivision or part of the affordable proposal. Further, he stated that the road was not completed and that he still owned the entire parcel. The plaintiff's attorney argued that one of CT Page 5118-FF the completed foundations was in a portion of the land not included in the affordable subdivision and thus permitted as of right. He did concede that the other foundation would have to be removed. Indeed, as noted in his brief, "[a]though [town planner] Mr. Schultz gave testimony that the roughed in road and third foundation were `inconsistent' with building the affordable plans, there was no testimony of any action that could not be altered with the assistance of a bulldozer." The plaintiff's argument must fail for two reasons. First, there is no question that the road layout has changed. A review of both the Ashley Park (Exhibit A) and the affordable plans (Return Item 77) reveals a totally different layout and thus, a triggering of subsection (a) of the resubdivision definition.
Second, as to the area designated for public use, while the plaintiff argues that no land has actually been transferred or dedicated, this is not the controlling factor. The relevant language of the definition is "a change in a map of an approved or recorded subdivision or resubdivision if such change . . . (b) affects any area reserved thereon for public use. . . ." A review of the approved subdivision map of Ashley Park indicates that open space land on the northeasterly portion of the parcel (which is designated as being "deeded to owners association") is 13.8301 acres. Additionally, a 2.8786 acre parcel of open space on the southerly portion abutting Foxon Road also indicates it will be deeded to "owners association." The modified affordable housing application map (Return Item 77) shows an open space parcel on the northeast of 11.2950 acres. This parcel is referred to in note 4 as follows: "[t]he open space as shown hereon is to be conveyed to the Town of North Branford's land trust. The open space is to be utilized for passive recreation, hiking, walking trails." The small piece on Foxon Road has been deleted entirely.
It is clear that the area reserved for public use has changed from the first application to the subject proposal. It should be noted that it is of no importance that the Ashley Park open space is to be deeded to the homeowners association and the affordable proposal is to be deeded to the land trust. The open space land, whether established under § 314 of the subdivision regulations[5] or § 42A.4.4 of the affordable housing section of the zoning regulations or both, derives its statutory basis from § 8-25 of the General Statutes. That section states, in part, that "[s]uch regulations shall also provide that the commission may require the provision of open spaces, parks and playgrounds when, and in places, deemed proper by the CT Page 5118-GG planning commission, which open spaces, parks and playgrounds shall be shown on the subdivision plan." In Aunt Hack RidgeEstates v. Planning Commission, 160 Conn. 109; 117-118,273 A.2d 880 (1970), our Supreme Court upheld the open space requirement utilizing the traditional exaction test, i.e. whether the burden cast upon the subdivider is specifically and uniquely attributable to his own activity. The court noted that "[w]hen it undertakes to subdivide, the population of the area is necessarily increased and the need for open space for its people becomes a public one." Id., 119. The subdivision regulations authorize the Commission to determine which entity will end up with the open space. The North Branford Land Conservation Trust and a homeowners' association are but two of a number of entities approved for receipt of the open space land. A review of the applicable regulations, including § 314A, indicates that one of the considerations for open space is "the meeting of neighborhood and/or community-wide recreational needs." There is nothing in the subdivision regulations that would allow an interpretation that the open space requirement is for anything other than the statutory purpose as discussed above. Nor is there anything which would suggest that the statutory purpose would be changed by the specific recipient. Accordingly, as the public use area is affected, the resubdivision statute is triggered.
To the extent the applicant has proposed changes to a recorded subdivision and the changes implicate the resubdivision definition, this court agrees with the Commission that no practical relief can be obtained from this appeal. "It is not the province of our courts to decide moot questions, the determination of which cannot result in the granting of actual or practical relief. . . ." Saad v. Colonial Penn. Ins. Co.,32 Conn. App. 190, 193, 628 A.2d 623 (1993). "An actual controversy must exist not only at the time the appeal is taken, but also throughout the pendency of the appeal." B D Associates v. Boardof Examiners for Professional Engineers and Land Surveyors,41 Conn. App. 827, 830, ___ A.2d ___ (1996). In Gagnon v. PlanningCommission, supra, 222 Conn. 297, the court upheld the dismissal of a subdivision appeal for mootness where, after the appeal was filed, the owner's subsequent request and approval for a resubdivision went unchallenged. The court reasoned that as a result of the resubdivision, any benefit from the first approval was extinguished. Id., 298. While the facts in this case are, of course, different, the result is the same. The affordable housing proposal would have to start again and comply with the public hearing process. While this court has the power to remand, CT Page 5118-HH General Statutes § 8-30g(c), nothing would be served as the plaintiff must, due to his recording the Ashley Park map and commencement of construction as discussed above, start the whole process again. The appeal from the Commission's decision, therefore, is dismissed.
 B.
1.
The plaintiff's other case involves an appeal from the Board's decision denying a variance request to allow eleven lots to be connected to individual septic systems. As a threshold matter, the Board suggests that this case is also moot because of the development of the Ashley Park subdivision. It argues that under the affordable housing regulations, § 42A.8 et. seq., the development process involves two steps: (1) obtaining a special use permit and (2) obtaining a subdivision permit and, that as the subdivision issue is moot for the reasons set forth above, the variance appeal is also moot. This court is not in agreement as the variance request stands alone from the subdivision process.
It is obvious that the Board can not vary any provision of the subdivision regulations; its variance authority only applies to zoning regulations — in this case, § 42A.8.3. A grant of such request could then be utilized by the successful applicant to obtain the special use permit (and the subdivision permit to the extent it is applicable.) While the subdivision regulations do, of course, include provisions pertaining to sanitary sewer disposal, the specific requirement herein, namely that all lots be connected to municipal sewers, is a zoning regulation.
In this case, a special use permit was granted on May 7, 1992 and then extended for one year. The parties now disagree over whether that permit is still effective but a decision on this issue is not critical or even needed for this appeal. The present matter is not a review of the Commission's decision issuing the special use permit; rather, it involves a review of whether the Board improperly denied the variance request. If the special use permit is still valid, a Board decision granting the variance would not affect the previously issued permit. If the permit was invalid or if the applicant sought a new special use permit with the modification, the Board's approval could be used in the new CT Page 5118-II application process. Accordingly, this court will not dismiss this case as moot.
2.
 a.
The Board first challenges the applicant's contention that the Affordable Housing Act, General Statutes § 8-30g applies to this appeal. As noted above, the legislature defined an "affordable housing application" to mean "any application made to a commission in connection with an affordable housing development. . . ." General Statutes § 8-30g(a)(2). General Statutes § 8-30g(a)(4) defines "commission" to mean "a zoning commission, planning commission, planning and zoning commission, zoning board of appeals or municipal agency exercising zoning or planning authority." The Board argues that despite the plain language of the Act, the legislature only intended the statute to apply to those bodies exercising planning and zoning authority. Referring to General Statutes § 8-1 which states, inter alia, that "any municipality, may by vote of its legislative body, adopt the provisions of this chapter and exercise through a zoning commission the powers granted hereunder," the Board argues that with one certain exception, i.e., for those few zoning boards of appeals that by regulation hear and decide special permits or special exceptions; see, Tondro, Connecticut Land Use Regulation, 2nd Ed., § 3F; Fuller, 9 Connecticut Practice Series, Land Use Law and Practice, § 8.4, the zoning authority does not apply to boards of appeal. Additionally, the Board posits that as there is no comma in the definition after "zoning board of appeals," the phrase "exercising zoning or planning authority" was inserted to cover just such a situation. This court does not agree.
In West Hartford Interfaith Coalition. Inc. v. Town Council,228 Conn. 498, 636 A.2d 1342 (1994), our Supreme Court addressed the § 8-30g(a)(2) definition of an "affordable housing application" adopting an expansive view of the term noting that "the language of § 8-30g [applied] to every type of application filed with a commission in connection with an affordable housing proposal." Id., 509. In Kaufman v. ZoningCommission, 232 Conn. 122, 137, 653 A.2d 798 (1995), the Court stated:
The statute assumes that many different types of CT Page 5118-JJ applications will be brought to many different types of agencies, as it broadly applies to "any application made to a commission in connection with an affordable housing development" (emphasis added); General Statutes § 8-30 g(a)(2); and as it defines "commission" as any "zoning commission, planning commission, planning and zoning commission, zoning board of appeals or municipal agency exercising zoning or planning authority." General Statutes § 8-30g (a)(4).
The rules for interpreting legislation are clear. They were most recently set forth in State v. Anonymous, 237 Conn. 501,514-515 (1996):
 "[T]he process of statutory interpretation involves a reasoned search for the intention of the legislature. . . . In seeking to discern that intent, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation . . . and to the jurisprudential background of the statute." (Citations omitted; internal quotation marks omitted.) State v. Piorkowski, 236 Conn. 388, 404, 672 A.2d 921 (1996). "`It is fundamental that statutory construction requires us to ascertain the intent of the legislature and to construe the statute in a manner that effectuates that intent.'" Murchison v. Civil Service Commission, 234 Conn. 35, 45, 660 A.2d 850 (1995). "The law favors rational and sensible statutory construction. . . . The unreasonableness of the result obtained by the acceptance of one possible alternative interpretation of an act is a reason for rejecting that interpretation in favor of another which would provide a result that is reasonable. . . . When two constructions are possible, courts will adopt the one which makes the [statute] effective and workable, and not one which leads to difficult and possibly bizarre results." (Citations omitted; internal quotation marks omitted.) Maciejewski v. West Hartford, 194 Conn. 139, 151-52, 480 A.2d 519 (1984). We "`consider the statute as a whole with a view toward reconciling its parts in order to obtain a sensible and rational overall interpretation.'" Fruin v. Colonnade One at Old Greenwich Ltd. Partnership, 237 Conn. 123, 130, ___ A.2d ___ (1996). We have long followed the CT Page 5118-KK guideline that "[t]he intent of the lawmakers is the soul of the statute, and the search for this intent we have held to be the guiding star of the court. It must prevail over the literal sense and the precise letter of the language of the statute. . . . When one construction leads to public mischief which another construction will avoid, the latter is to be favored unless the terms of the statute absolutely forbid." (Citations omitted.) Bridgeman v. Derby, 104 Conn. 1, 8, 132 A. 25 (1926).
As noted by the court, "[a]s a remedial statute, § 8-30g
`must be liberally construed in favor of those whom the legislature intended to benefit.'" Kaufman, supra, 231 Conn. 140;Town Close Associates v. Planning Zoning Commission, 42 Conn. App. 94,105, ___ A.2d ___ (1996). In West Hartford Interfaith,
supra, 228 Conn. 509-510, the Supreme Court reviewed the legislative history of the Act and concluded that "the key purpose of § 8-30g is to encourage and facilitate the much needed development of affordable housing throughout the state." Id., 511. See also, Wisniowki v. Planning Commission, 37 Conn. App. 303,316-317, 655 A.2d 1146 (1995). Recently the Appellate Court noted in Town Close Associates v. Planning ZoningCommission, supra, 42 Conn. App. 105, that depending on how a commission interprets the Act, "a municipality could amend its zoning regulations ostensibly to permit affordable housing developments, but then, acting under the pretext of its other zoning regulations, effectively preclude the construction of an affordable housing development. Such a result is contrary to the letter, spirit and legislative history of § 8-30g." Id.[6]
 b.
The Board's argument concerning the use of the word "or" also fails because it violates traditional rules of grammar and statutory construction. Commas are used to separate the four boards and the conjunction "or" is used before the phrase "municipal agency." Webster's New World Dictionary, defines the word "or" as "a coordinating conjunction introducing an alternative or the last in a series of choices." The Board's argument would be more persuasive if the word "or" had been placed before the phrase "zoning board of appeals" to indicate that it and "municipal agency" were the final choice. It should also be noted that "where a qualifying phrase is separated from several phrases preceding it by means of a comma, one may infer that the qualifying phrase is intended to apply to all its CT Page 5118-LL antecedents, not only the one immediately preceding it." Sanzonev. Board of Police Commissioners, 219 Conn. 179, 190,592 A.2d 912 (1991).
To the extent the Board argues that in this case the word "or" is used to introduce a synonymous word or phrase (the second definition in Webster's) so that "zoning board of appeals" and "municipal agency" should be read as equivalent, there is no support in the legislative history for this interpretation. Indeed, there is no mention of this interpretation anywhere in that history. Our Supreme Court has noted, in a different factual situation, that "[a]though such a conjunction may indicate the legislature's intent, in this case that intent, without further contextual support, is unclear. . . . We decline to give weight to such an ambiguous grammatical distinction." Dos Santos v. F.D.Rich Construction Inc., 233 Conn. 14, 25, 658 A.2d 83 (1995). Additionally, the court has also reminded us that the intent of the legislature is determined "not in what it meant to say, but in what it did say." Sanzone v. Board of Police Commissioners,
supra, 219 Conn. 187.
More importantly, however, the Board's interpretation does not make sense. The first four terms are all well known terms of art — well defined and discussed. The last term, "municipal agency", is not a well known creature in the land use lexicon. Nevertheless, there are certain municipalities which have existing non land use commissions, boards, or agencies that exercise statutory land use powers whether by adopting the statutory provisions or by special act. For instance, in the town of West Hartford, the town council is cloaked with the zoning authority. See, West Hartford Interfaith. Inc. v. Town Council,
supra, 228 Conn. 500; see also, Fuller, supra, § 1.6. Thus, the modifying clause makes sense in that context. Applying it to a zoning board of appeals does not, however, since that board cannot statutorily administer the planning power. As mentioned earlier, General Statutes § 8-6 authorizes a zoning board of appeals to act administratively in reviewing special permits or special exceptions but the board can never act in the planning capacity. Its powers are limited by General Statutes § 8-6. Courts must assume that the legislature intended a reasonable and rational result and must, when possible, construe statutes accordingly. Masone v. Zoning Board, 148 Conn. 551, 556,172 A.2d 891 (1961). A municipal agency could be given both zoning and planning powers much as a combined planning and zoning commission exercises the combined powers, but that is not the case with a CT Page 5118-MM zoning board of appeals. Thus, the rational interpretation of the contested phrase is that it modifies only "municipal agency." Accordingly, as the Board falls within the statutory definition of "commission" as set forth in General Statutes § 8-30g(a) (4) and as the application meets the statutory definition of "affordable housing application" as set forth in General Statutes § 8-30g(a)(2), this court must review the Board's decision under the Act.
3.
In order to obtain a variance, an applicant must satisfy two conditions: "(1) the variance must be shown not to affect substantially the comprehensive zoning plan, and (2) adherence to the strict letter of the zoning ordinance must be shown to cause unusual hardship unnecessary to the carrying out of the general purpose of the zoning plan." Grillo v. Zoning Board of Appeals,206 Conn. 362, 368, 537 A.2d 1030 (1988); General Statutes §8-6. To the extent a variance is a grant to use property in a manner forbidden by the zoning regulations, Kelly v. Zoning Boardof Appeals, 21 Conn. App. 594, 597, 575 A.2d 249 (1990), "the power to grant should be exercised charily." Gregorio v. ZoningBoard of Appeals, 155 Conn. 422, 427, 232 A.2d 330 (1967).
The board is required to state the reasons for its decision, whether granting or denying, on the record. General Statutes § 8-7. Additionally, if the variance request is denied, the court must find whether any of the reasons given are valid and supported by the record. Green v. Zoning Board of Appeals,4 Conn. App. 500, 502, 495 A.2d 290 (1985). Fuller, supra, § 33.6. Moreover, if the board fails to state its reasons, the court must search the record to find the basis for the action.Ward v. Zoning Board of Appeals, 153 Conn. 141, 144, 215 A.2d 104
(1965). Traditionally, the burden of proof was on the plaintiff. General Statutes § 8-30g(c), however, states:
 (c) Upon an appeal taken under subsection (b) of this section, the burden shall be on the commission to prove,
based upon the evidence in the record compiled before such commission that (1) the decision from which such appeal is taken and the reasons cited for such decision are supported by sufficient evidence in the record; (2) the decision is necessary to protect substantial public interests in health, safety, or other matters which the commission may legally consider; (3) such public CT Page 5118-NN interests clearly outweigh the need for affordable housing; and (4) such public interests cannot be protected by reasonable changes to the affordable housing development. If the commission does not satisfy its burden of proof under this subsection, the court shall wholly or partly revise, modify, remand or reverse the decision from which the appeal is taken in a manner consistent with the evidence in the record before it. (Emphasis supplied.)
A review of this section indicates that the legislature has now placed the burden of proof on the Board, and not, as in traditional land use appeals, on the applicant. The Board is required to cite reasons for its decision and the reasons are to be supported by sufficient evidence.
4.
The genesis of this variance application was the action of the town's Water Pollution Control Authority which, despite recommendation and approval by the town engineer (Return Item 15), and the approval by the Commission, denied the applicant's request to connect the 42 lots to the municipal system. The Authority approved only 31 connections and hence, Mr. Frumento sought the variance to utilize on-site septic systems for the remaining eleven lots.[7] In support of his application, he submitted a report from the East Shore District Health Department which stated that the "individual lot test results revealed well-drained sandy loam soils with excellent to good percolation rates with no indication of elevated water tables." (Return Item 7). The health department therefore recommended approval of on-site systems for all of the requested lots. (Return Item 7). Other exhibits were presented at the hearing, including letters and petitions in opposition to the variance request, but none with any scientific or expert criticism on the proposal.
A review of the record indicates that three board members found no hardship and thus voted to deny the variance request. Additionally, one of the members did not state a reason and the Chairman voted to approve. (Return Item 21, p. 25).[8] While unstated, it appears that some Board members were unhappy with (1) being caught between two municipal agencies (Return Item 21, p. 21) and (2) allowing onsite systems on smaller lots. (Return Item 21, p. 23). CT Page 5118-OO
 a.
There is apparently no claim that the granting of a variance would substantially affect the comprehensive plan. Rather, as discussed, the Board believed that the unusual hardship requirement had not been met. A review of the record indicates that the only possible explanation for this position is that as the Authority had approved 31 lots, Mr. Frumento's request to develop more, i.e. the full 42, must be considered to be either self imposed or an attempt to use the property at its maximum potential. Each of these theories has been deemed to be obstacles to a finding that a hardship exists. Abel v. Zoning Board ofAppeals, 172 Conn. 286, 289, 374 A.2d 227 (1977); Garibaldi v.Zoning Board of Appeals, 163 Conn. 235, 239, 303 A.2d 743 (1972); Fuller, supra, § 9.3. Arguably, under a traditional review process, either or both of these reasons would be sufficient to sustain the Board's decision. This is not, however, a traditional review process as the reasons must be scrutinized under the §8-30g(c) standards. Thus, it is not enough that Mr. Frumento wishes to build more homes. Rather, the denial must be necessary to protect substantial public interests in health, safety and other relevant matters for consideration and these public interests must clearly outweigh the need for affordable housing. General Statutes § 8-30g(c)(2);(3).
"The hardship which justifies a board of zoning appeals in granting a variance must be one that originates in the zoning ordinance . . . and arises directly out of the circumstances or conditions beyond the control of the party involved." (Citations omitted.) Pollard v. Zoning Board of Appeals, 186 Conn. 32, 39-40,438 A.2d 1186 (1982). In this case, the requirement for connection to the municipal sewer system originates in the zoning regulations at § 42A.8.2 — a requirement that arguably exists only for an affordable housing development and for no other development. It is clear that the requirement is based solely on health and safety considerations and one can not argue that a requirement concerning sewage disposal is not an appropriate consideration for the Commission. See, BuildersService Corporation v. Planning Zoning Commission, 208 Conn. 267,545 A.2d 530 (1988). However, in this case, a review of the record indicates that from a health and safety position, the alternative to the municipal system requirement — the on-site system — was surely viable. There is no indication in the record that the Board took issue with the technical findings of the health department nor is there any indication in the CT Page 5118-PP record that the Board did not believe the findings of the department. As noted by our Supreme Court in Feinson v.Conservation Commission, 180 Conn. 421, 427-8, 429 A.2d 910
(1980), "on a subject as technically sophisticated and complex as pollution control, commissioners who have not been shown to possess expertise in this area may [not] rely on their own knowledge, without more, in deciding to deny a license to conduct a regulated activity." Id. While Feinson involved the denial of an inland wetlands permit and did not involve a zoning board of appeals, the principle remains the same. This Board did not address the substantive aspect of the request. The hardship was created by the regulations and by the Authority and not by the applicant. "Self-created hardship should not be applied where the regulations create a hardship themselves and the other requirements for a variance are met. . . ." Fuller, supra, § 9.3. As previously noted, this case does not involve an analysis of whether the requested variance would substantially affect the comprehensive plan. The Commission has stated that it does not; the Commission granted the special use permit for 42 lots. The use is presumptively appropriate for the district and in compliance with the comprehensive plan. It is clear, however, that the applicant's desire to build 42 homes is being cast as a desire to use the property at its maximum capacity and thus, not a hardship. This argument fails in this case because (1) the Commission did approve the use of 42 lots and (2) this is an appeal under the Act. The legislature recognized that traditional zoning standards would be modified in affordable housing developments. Indeed, in Wisniowski v. Planning Commission,
supra, 37 Conn. App. 303, 314 (1995), the court remarked that "[t]he affordable housing land use appeals act was enacted to deal with the particular problem of the lack of affordable housing in Connecticut" and that "[t]he narrow rigorous standard of § 8-30g dictates that the commission cannot deny an application on broad grounds such as noncompliance with zoning." Id., 314. A literal usage of the maximum enrichment doctrine would doom almost every affordable housing application which sought variance (whether in a statutory or informal sense) from a standard which stymied the building of the units. See, WestHartford Interfaith Coalition. Inc. v. Town Council, supra,228 Conn. 511. Thus, it must be viewed through the Act's § 8-30g(c) lens. Wisniowski v. Planning Commission, supra, 37 Conn. App. 317. In this case, there is not only no sufficient evidence in the record, there is no evidence at all that indicates the denial is necessary to protect substantial public interests in health, safety or other matters or that these interests outweigh CT Page 5118-QQ the need for the affordable housing. The Board's decision cannot be upheld.
 III Conclusion
For the above reasons, the appeal from the Commission's decision is dismissed as moot and the appeal from the Board's decision is sustained and the Board's decision is reversed. General Statutes § 8-30g(c); Wisniowski v. PlanningCommission, supra, 37 Conn. App. 320.
Berger, J.